**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────

SAMANTHA C. MILNER-KOONCE,

                       Plaintiff,

     v.                                                                                     No. 1:21-CV-1271
                                                                                                    (LEK/CFH)
ALBANY CITY SCHOOL DISTRICT and
HONEYWELL LAW FIRM,

                       Defendants.

─────────────────────────────

**APPEARANCES:**

Samantha C. Milner-Koonce
58 Kent Street
Albany, New York 12206
Plaintiff pro se

## REPORT-RECOMMENDATION AND ORDER

### I. In Forma Pauperis

Plaintiff pro se Samantha C. Milner-Koonce ("plaintiff") purported to commence

this action on November 29, 2021, by filing a complaint.  See Dkt. No. 1 ("Compl.").  In

lieu of paying this Court's filing fee, she submitted a motion to proceed in forma

pauperis ("IFP").  See Dkt. No. 2.  The undersigned has reviewed plaintiff's IFP motion

and determines that she financially qualifies to proceed IFP for the purpose of filing.[1]

─────────────────

[1] Plaintiff is advised that although she has been granted IFP status, she is still required to pay any costs
and fees that she may incur in this matter, including, but not limited to, any copying fees or witness fees.

## II. Initial Review

### A. Legal Standard

Section 1915[2] of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that . . . the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed with his action.

Where, as here, the plaintiff proceeds pro se, "the court must construe his [or her] submissions liberally and interpret them to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (citation and internal quotation marks omitted). This does not mean the Court is required to accept unsupported allegations that are devoid of sufficient facts or claims. Although detailed allegations are not required at the pleading stage, the complaint must still include enough facts to provide the defendants with notice of the claims against them and the grounds on which these claims are based. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic v. Twombly, 550 U.S. 544, 555-56 (2007). Pro se litigants are "not exempt . . . from compliance with relevant rules of procedural and substantive law[.]" Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (citation omitted).

---

[2] The language of 1915 suggests an intent to limit availability of IFP status to prison inmates. See 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. See, e.g., Fridman v. City of N.Y., 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

Ultimately, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted).

Pleading guidelines are set forth in the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Specifically, Rule 8 provides that a pleading which sets forth a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "The purpose . . . is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Rule 8 also requires the pleading to include "a short and plain statement of the grounds for the court's jurisdiction" and "a demand for the relief sought . . . ." FED. R. CIV. P. 8(a)(1), (3). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d)(1).

Further, Rule 10 provides in pertinent part that:

> [a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b).  This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 55 (internal quotation marks and citations omitted).  A complaint that fails to comply with the pleading requirements "presents far too [] heavy [a] burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996).  The Second Circuit has held that "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative . . . to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citation omitted).  However, "[d]ismissal . . . is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citation omitted).  If dismissal is warranted and the plaintiff is pro se, the court generally affords the plaintiff leave to amend the complaint.  See Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995).

## B. Plaintiff's Complaint[3]

Plaintiff was hired by the Albany City School District ("School District") in September 2015 for a ten-month position as an Attendance Clerk.  See Compl. at 6. Plaintiff states that she is "a qualified individual with a disability." Id.  When she was hired, plaintiff had the ability to "customiz[e] [her] time off request[s]" and seek leave by the hour to attend physical therapy. Id. at 9.  On December 6, 2019, plaintiff attempted

---

[3] Plaintiff's complaint is ordered by paragraph numbers, however, she utilizes subparagraphs, labeling them, for example, as 12a, 12b, and 12c.  See Compl. at 8.  For the sake of clarity, the Court will refer to plaintiff's complaint by page number.

4

to sign herself out for one hour and Donna Lounello, and "Mrs. Horan who was the time management person at the school[,]" told plaintiff she could only take time off in half-day increments.  Id.  Plaintiff expressed confusion because she had previously been able to take time off by the hour and Mrs. Horan stated that she would speak to Human Resources ("HR").  See id.  On January 13, 2020, plaintiff attempted to sign herself out in the electronic system but the "custom feature was no longer available" and there were only half-day options.  Id.

On June 30, 2020, Guidance Secretary Anna Rita Mele retired and the School "retired the position[.]"  Compl. at 7.  Following plaintiff's return from medical leave on October 2020,[4] plaintiff was informed that she would be assuming "Guidance duties." Id.  Plaintiff asked if the increased responsibility would come with a raise and she was told that HR would be contacted.  See id.  On October 6, 2020, she applied for "'Covid 19 Paid leave' through the district as [her] grandson['s] school was operating remotely Wednesday – Thursday."  Id.  While working from home, and because of her grandson needed more attention than expected as he was recently diagnosed with Attention Deficit Hyperactivity Disorder, she "called Mr. [William] Rivers and Ms. [Andrea] West to inform them [she] could not complete [her] work from home and tend to [her] grandson's need."  Id.  Plaintiff "attempted to reach Ms. West, Wednesday Thursday and Friday via telephone regarding my expectations for the upcoming week.  Monday October 12th, [she] did not attend work as [she] did not know my expectations."  Id. at 8.  After Ms. West returned plaintiff's call, she provided plaintiff "with a lecture, performance expectations and then proceeded to inform [her] of [her] being paid for Wednesday

---

[4] Plaintiff alleges that she suffered a "work-related injury" on May 17, 2018.  Compl. at 6.  It is unclear when plaintiff took medical leave and whether it was in relation to that injury or something else.

through Friday.  As [plaintiff] was expected to be at work on Monday and did not, [she] was being docked a days' pay." Id.  Plaintiff states that she "did not understand as [she] logged on and responded to an e-mail from Mr. Rivers as that was the only task [she] received for the day." Id.  Plaintiff states that she was "granted . . . special Accommodations" under the Americans with Disabilities Act "(ADA") on October 22, 2020, which did not suffice so [she] re-requested a leave of absence on October" 23, 2020 under the Family Medical Leave Act ("FMLA"). Id.  The request was made because plaintiff "could not commit to both [her] job responsibilities and [her] grandson[.]" Id.  Ms. West "emailed [plaintiff] a copy of her approv[ed]" leave on October 23, 2020. Id.  On November 6, 2020, plaintiff e-mailed Ms. West and asked why her ADA approved-leave was sent via e-mail. See id.  On November 9, 2020, Ms. West responded and said that all requests for reasonable accommodations related to COVID are sent via e-mail and US Postal mail.  In this response, Ms. West stated that plaintiff's leave "would not start until October 26, 2020[.]" Id.  Plaintiff asserts that "[a]lthough [her] request for leave was documented on October 6th and [she] was granted reasonable accommodation on October 22nd, 2020, which did not suffice so [she] re-requested a leave of absence again on October 23rd and it was approved but was not applied until Monday, October 26th, 2020, causing [her] to be docked pay once again." Id.  Plaintiff responded to Ms. West, explaining that she never received personal information via e-mail unless requested. See id.  On October 26, 2020, Mr. Rivers e-mailed plaintiff, stating that he noticed that her leave was approved from "10/26 to 12/23 so he would be signing [her] out in Absence Manager for October 23, 2020[,] as he noticed [she] did not response to voicemail and emails." Id.  Plaintiff asserts that "Mr.

Rivers is the Myers Middle School Principal.  It is not his job to adjust an individuals' time.  That is the responsibility of the Office Manager or HR."  Id.  Plaintiff contends that "[w]hen [she] originally applied for leave; October 6th, 202[0], it should have been granted until Ms. West granted the ADA special Accommodations on October 22nd, 202[0] instead of docking [her] pay.  [A]s Mr. Rivers is not an HR rep and ha[s] no knowledge of laws governing leave request, he should not have been permitted to tamper with [her] time management."  Id.

Plaintiff returned from leave on January 22, 2021.  See Compl. at 10.  When she returned she placed her belongings on her desk and stepped away for a moment.  See id.  When she returned, "the individual subbing for [her], removed [her] belongings and placed them on a chair next to [her] desk."  Id.  Plaintiff met Mr. Rivers in his office and he told her that she would be seated somewhere else and Kyrn Mason, the woman subbing for her, would remain at her desk.  See id.  Mr. Rivers informed plaintiff that she was to remain at her new desk until she could be trained on Guidance duties.  See id.  Plaintiff also asked Mr. Rivers about her "gel cushion for [her] buttocks [that she] used[,]" her chair, and a heater tower she purchased.  Id.  Mr. Rivers "responded by saying it was [plaintiff's] responsibility to keep up with [her] belongings and to follow up with maintenance.  [Plaintiff] felt out of place, unwelcomed, embarrassed and humiliated.  Staff would . . . ask why [she] was not seated at [her] desk, and [she] just smiled to cover [her] true feelings."  Id.  Plaintiff then went to check her mailbox and her name tag and title had been removed and Ms. Mason's name was placed on the mailbox.  See id.  "The content [she] had in [her] mailbox were discarded as well[]" and she felt "unwelcomed and violated."  Id.  The next day, her name was added alongside

7

Ms. Mason's, but Ms. Mason's label retained the title of Attendance Clerk.  See id. Plaintiff asserts that "[w]hen any other staff take a leave of absence[], their names are not removed and never has the sub['s] name been placed on their mailbox."  Id.

On January 25, 2021, plaintiff e-mailed Ms. West to request time off.  See Compl. at 9.  Ms. West responded to plaintiff on February 1, 2021, and informed plaintiff that she "had exhausted FMLA leave, and [] was out of sick time.  She went on to state that [plaintiff] could take an unpaid leave of absence once [she] supplied the district with substantiating documentation.  She went on to advise this leave could not be taken intermittently."  Id.  Plaintiff explained that "[i]ntermittently is what [she] was requesting as physical therapy could be done from 2:15pm-3:15pm.  [She] was expected to attend physical therapy appointments 2 times a week for 6 weeks.  [Her] work hours were 7:45am – 3:15pm.  [She] would usually take [her] lunch at 2pm and return at 2:30pm."  Id.  Plaintiff contends that her intermittent leave should have been granted because "[o]n October 6, 2021, Mr. Rivers afforded Ms. Reeves the ability to leave work 15 to 30 minutes early every day to pick up her children.  She was not required to use her time, nor did she use FMLA."  Id.

On January 29, 2021, Mr. Rivers e-mailed plaintiff an assignment, asking her to contact a list of students to ask about their completed assignments.  See Compl. at 10.  Mr. Rivers carbon-copied ("cc'ed") Ms. Koldis, the Guidance Counselor, Ellen Green, and Mrs. Lounello.  See id.  On February 1, 2021, Mr. Rivers again e-mailed and cc'ed the same individuals "regarding [plaintiff] not completing the work."  Id.  Plaintiff states that Mr. Rivers assumed she had not done the work and asked her to complete it by the end of the day, but she had completed it "the day it was assigned."  Id.  On February 3,

2021, plaintiff e-mailed Ms. West, Mr. Rivers, Joseph Burke, the Homeschool
Coordinator, Mrs. Reeves, and Olive Farooq the school nurse, informing them that her
daughter tested positive for COVID-19, and she would need to quarantine.  See id. at
11.  On February 4, 2021, Mr. Rivers e-mailed plaintiff and explained that if she ""was
well enough to work, to follow [her] regular scheduled duties[,]" and if not, to sign herself
out of work.  Id.  He e-mailed again and asked if she was working that day and plaintiff
responded, saying that she was working and she had "completed all task that were
allowable from home and then inquired if there was something he needed [her] to do."
Id.  Mr. Reeves responded, recommending she sign herself out as he "felt [she] could
not commit to [her] full duties."  Id.  Ms. West then e-mailed plaintiff a list of
expectations, including a requirement that she provide an e-mail summary of the tasks
she completed at the end of the day.  See id.  At the end of the day, plaintiff responded
explaining what she had done that day, "advised them that [she] would be signing
[her]self out in absent manager . . . for the rest of [her] quarantine and advised they act
regarding a COVID safety concern prior to [her] return."  Id.  Plaintiff "[a]lso advised that
[she] was aware [she] was due back from quarantine February 11th, 2021, but would
not be in attendance until February 12th, as [she] had to attend doctor's appointments."
Id.  Plaintiff "also informed them that [she] was aware [she] would not be paid for this
time off."  Id.  Plaintiff "felt this whole incident was too much and struck [her] as strange
and overbearing.  To do away with this nonsense, [she] just decided to sign [her]self out
. . . .  [She] questioned why [Mr. Rivers] required [certain expectations] from [her] but
other people working from home did not have the same expectations."  Id.

On February 12, 2021, plaintiff returned to work and Mrs. Lounello told plaintiff she was not allowed in the building because she was supposed to be quarantining.  See Compl. at 11-12.  The school nurse clarified that plaintiff was cleared to be at work and plaintiff went to her desk.  See id. at 12.  Mr. Rivers sent plaintiff an e-mail with a priority list of tasks, which "consisted of [her] catching up on work from the time [she] went out on quarantine until the date of [her] return which was 2/3-2/12."  Id.  Other tasks were e-mailed to her from other employees but she did not handle them and continued tackling the priority list.  See id.  Ms. Koldis "insisted" that plaintiff complete a task in an email sent that morning but plaintiff asserts that she "did not see the message until later in the day and never got the opportunity to complete it."  Id.  She emailed Ms. Koldis to inform her of the priority list Mr. Rivers had assigned, and Ms. Koldis stated, "Everything is there as I have forwarded to you, you just need to issue [] a working card.  This was marked high priority also Sam and I sent them first things this AM, these parents/kids have been waiting and were told they would be mailed today."  Id.  Plaintiff "did not respond, [and] continued with [the] priority list assigned by Mr. Rivers."  Id.  Mr. Rivers also e-mailed asking plaintiff to complete a COVID-19 form that was in her e-mail inbox, to which plaintiff responded that she had already filled out the form in the nurse's office.  See id.  Mr. Rivers explained that in the future, plaintiff needed to complete the e-mailed form.  See id. at 13.

On February 22, 2021, plaintiff "went to work against her better judgment as she was experiencing a great deal of pain stemming from her hip injury she acquired at work" and she was waiting for approval for workers compensation "to have [her] labrum tear repaired."  Compl. at 13.  Plaintiff stated that she is on blood thinners and cannot

take Motrin or Advil, only Tylenol, which provides short relief.  See id.  At work, plaintiff was asked to issue "Working Cards" by Ms. Koldis.  Id.  Plaintiff "skimmed over the applications and it did not look like a typical working paper permit application for a student but being that [Ms. Koldis] was the 'Guidance Counselor,' and to avoid trouble, [she] issued the card anyway."  Id.  "The other application, the physical was outdate, and [plaintiff] issued the care to that student as well."  Id.  " Mr. Rivers was cc'd on these e-mails and said nothing."  Id.  Plaintiff e-mailed Ms. Koldis and asked about a google document to record information from the Working Cards.  See id.  Ms. Koldis responded, "Khym didn't show you all of this?  There is a Google Form that she created. I will have to go into my email to look for it, but I am surprised she didn't show you all of this."  Id.  "After reading [Ms. Koldis'] response, [plaintiff] gave into [her] pain and had a nervous breakdown at the desk.  [She] immediately called the office and asked Mrs. Reeves, to come out and speak with [her] as [she] felt [her]self becoming ungrounded." Id.  Mrs. Reeves "agreed [that] the tone of the emails and words said were inappropriate" and advised plaintiff to inform Mr. Rivers.  See id. at 13-14.  Plaintiff "declined her advice as he was cc'd on all e-mails from office employees[.]"  Id. at 14. Plaintiff "felt unwelcomed, intentionally targeted, helpless and belittled as [she] knew he was in receipt of her e-mails and failed to intervene."  Id.  Plaintiff then left work early, on the advice of Mrs. Reeves "to go home and calm down."  Id.  "The next day, [plaintiff] took a Mental Health Day as [she] went to bed in tears and was not feeling well when [she] arose from [her] bed the next morning.  [She] was mentally and emotionally overwhelmed and stressed out."  Id.

On February 23, plaintiff contacted her Union representative Bridget Dolan to set up a meeting with Mr. Rivers.  See Compl. at 14.  Mr. Rivers responded to the request by saying that he also wanted to meet because he had concerns about plaintiff.  See id. They agreed to meet on February 25, 2021.  See id.  On February 24, Ms. Lounello asked plaintiff about the Working Cards she had completed and stated that they were incorrect and parents needed to be contacted.  See id.  On February 25, Ms. Lounello e-mailed Ms. Koldis about the Working Cards and Ms. Koldis completed them "as she should have when she assigned the duty to [plaintiff]."  Id.  On February 26, plaintiff received an mail from Ellen Green that was sent to all of the Guidance Counselors explaining the proper procedure for completing Working Cards.  See id. at 15.  Plaintiff states that Ms Koldis "neglected to comply with those steps when she directed [plaintiff] to send out the Working Cards and Mr. Rivers failed his duty as the principal when he intentionally neglected to intervene upon receipt of Ms. Koldis['] emails to [plaintiff]."  Id.

Plaintiff states that on March 22, 2021, when she would call to the office, no one would answer or it would ring for a long time.  See Compl. at 15.  The meeting between plaintiff and Mr. Rivers was postponed from February 25 until March 24 after plaintiff returned from medical leave related to a Workers Compensation claim.  See id.  During the meeting, plaintiff states that Mr. Rivers was "dismissive and accusatory and chose to engage in defamatory behaviors[.]"  Id.  "At one point, he brought up the incident involving Ms. Kruse.  He understated her behavior as to excuse it and began to reprimand [plaintiff] for making a statement [plaintiff] never made.  He stated regardless of what [Ms. Kruse] did, [plaintiff's] threatening to punch her in the face was

unacceptable and it was not going to be tolerated."[5]  Id.  Mr. Rivers also told plaintiff that her time utilization was unacceptable as well as her leaving ninety minutes early without permission.  See id.  Mr. Rivers stated that her "leaving early had nothing to do with [her] work-related injury[]" and "attempted to state [that she] did not complete several assignments in which [she] asked for following the meeting."  Id. at 15-16.  Ms. Dolan explained to Mr. Rivers that HR was monitoring plaintiff's time off, that Guidance was a new task that plaintiff was familiarizing herself with, and that he should not have brought up the "punching in the face" comment.  Id. at 16.

On March 29, 2021, Mr. River e-mailed plaintiff, which she did not see until March 30, 2021.  See Compl. at 16.  Mr. River cc'ed Lori McKenna, the Assistant Superintendent of middle schools, and Matthew Petrin from HR.  See id.  The e-mail contained a list of expectations for her job and listed "areas of concern" including plaintiff's "multiple no call/no shows or failure to call out into absence manager for absences"; "inability to complete [her] job assignments"; and "negative impact on building culture disrupting overall building efficiencies[.]"  Id.  Mr. Rivers explained that staff felt unsafe around plaintiff and that in the future she was "to bring [her] concerns to [Mr. Rivers] and request leaving early through the administration only."  Id. at 17.  Mr. Rivers stated that he was going to submit the "memo" to Mr. Petrin and Ms. McKenna on April 2, 2021, with or without plaintiff's signature.  Id.  This e-mail made plaintiff cry and caused an anxiety attack such that she "went to the Emergency Room and was provided with a sedative to assist [her] with calming down."  Id.  Plaintiff responded to the e-mail on April 5, 2021, and cc'ed Mrs. Kaweda Adams, Mr. Petrin, and Ms.

---

[5] It is unclear from the complaint what incident Mr. Rivers was referring.  See generally Compl.

McKenna, and made them "aware of [her] concerns and complaints of bullying, harassment, defamation, unfair pay and discriminatory acts." Id.

On April 9, 2021, plaintiff filed an EEOC claim for disability discrimination. See Compl. at 17. The School District hired the Honeywell Law Firm ("Honeywell") to represent them during the EEOC proceedings. See id. Plaintiff asserts that the "Honeywell Law Firm did not put its client's best interest first and correctly advise them that it is slander and libel to fabricate a story about a person. They failed to advise the District of it possibly being a crime to accuse a person of threatening to cause harm to an individual without proof and then attempt to punish the person for that alleged act."[6] Id. Plaintiff contends that Honeywell "should have inquired as to the validity of the accusation before submitting it as a part of their Position Statement to the EEOC." Id. On April 13, plaintiff was out of work due to hip pain interfering with the knee and shin. See id. On April 27, she underwent hip surgery and Mr. Rivers requested to meet. See id. Plaintiff responded to Mr. Rivers informing him that she would be happy to meet when she returned to work. See id.

On August 31, 2021, the EEOC dismissed plaintiff's claim. See Compl. at 18. According to plaintiff this is when "[t]he retaliation began[.]" Id. While she "was out on medical leave recovering from [her] hip surgery . . . "[t]he City School District of Albany partitioned the Board of Education for [her] transfer to another school[.]" Id. This transfer would change her normal schedule that was Monday through Friday, 7:15am to 3:15pm to working at two schools: the first school from 8:30am to 12pm and the second school from 1pm to 3:30pm. See id. On September 14, plaintiff met with Ms. West to

---

[6] Plaintiff does not explain the specifics of the report that Honeywell submitted to the EEOC but indicates that it relayed information relating to plaintiff's and Ms. Koldis' alleged altercation. See Compl. at 17-18.

discuss her options for returning to work and Ms. West communicated the transfer

options.  See id.  The options were all twelve-month positions, but plaintiff explained

that she needed a ten-month position to care for her grandson over the summer.  See

id.  Ms. West discussed which schools could "afford to lose 2 mo[n]ths of assistance"

and informed plaintiff of two schools where she could work.  Id.  Plaintiff communicated

that she wanted to continue working at Myers but told Ms. West she would think it over.

See id.  Plaintiff later e-mailed Ms. West explaining that she wanted to stay at Myers.

See id. at 19.  Plaintiff again met with Ms. West "and she continued to steer [plaintiff]

towards" the new schools.  Id.  "Finally, [plaintiff] gave in and said OK [she] will try it out.

[She] stated first [she] wanted to pick up [her] belongings from Myers."  Id.  When she

went to pick up her things, they "were already packed in a draw.  [Her] lamp was broken

and missing a bulb and [her] wire frame name [her] son purchased from Atlanta for [her]

50th birthday was stretched out and destroyed."  Id.  She left the building and "broke

down and cried once again as [she] finally realized [she] was not afforded an option,

[she] was nicely being told [she] was not wanted or welcomed back at Myers."  Id.

Plaintiff then purported to commence this action by timely filing her complaint on

November 29, 2021.[7]  See Compl.

## C. Analysis[8]

### 1. Claims against Albany City School District

---

[7] Plaintiff had 90 days from receipt of the EEOC dismissal notice to file her complaint.  See Tiberio v. Allergy Asthma Immunology of Rochester, 664 F.3d 35, 37 (2d Cir. 2011) (per curiam) (citations omitted) ("In order to be timely, a claim under the ADA must be filed in federal district court within 90 days of the claimant's receipt of a right-to-sue letter from the EEOC."); see also Dkt. No. 4 at 2.

[8] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

Construing plaintiff's complaint to raise the strongest arguments, she asserts a discrimination and retaliation claim under the ADA, as well as claims under the FMLA, Equal Pay Act ("EPA"), the Genetic Information Nondiscrimination Act ("GINA"), and Title VII.  Plaintiff also appears to raise a state law claim for intentional infliction of emotional distress.  See generally Compl.

### a. ADA

Plaintiff asserts that her application for leave on October 6, 2020 "should have been granted until Ms. West granted the ADA special accommodations on October 22nd, 202[0] instead of docking [her] pay."  Compl. at 8.  Plaintiff also asserts that she was denied access to hourly leave and that it was "unrealistic and unreasonable" for her to have to take a half-day off to attend her one-hour physical therapy appointments.  Id. at 9.  Further, plaintiff appears to allege that Mr. River's conduct violated the ADA and ultimately resulted in her transfer to other schools.  See id. at 11, 16-17.

To succeed on an ADA claim, "[a] plaintiff must prove that"

> (1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability.

Kinneary v. City of N.Y., 601 F.3d 151, 155-56 (2d Cir. 2010) (quoting Capobianco v. City of N.Y., 422 F.3d 47, 56 (2d Cir. 2005)) (quotation marks omitted).  "[T]he evidence necessary for the plaintiff to satisfy this initial burden is 'minimal' and 'de minimis[.]'" Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001) (citations omitted).  "[T]o establish the existence of a disability, a plaintiff must demonstrate that he or she suffers from a physical or mental impairment that "substantially limits one or more major life activities. . . .'"  Wega v. Ctr. for Disability Rts., No. 06-CV-6375, 2009

16

WL 3199684, at *7 (W.D.N.Y. Sept. 30, 2009) (quoting 42 U.S.C. § 12102(2)(A)), aff'd 395 F. App'x 782 (2d Cir. 2010) (summary order).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  "The mere presence of a medical condition does not establish that a plaintiff is disabled." O'Donnell v. King B 100, LLC, No. 14-CV-1345 (TJM), 2016 WL 7742779, *9 (N.D.N.Y. May 3, 2016) (citations omitted).  "In addition, it is well settled that temporary impairments with little or no long-term permanent impact are not disabilities under the ADA."  Id. (citations omitted).  "Such temporary or 'transitory' impairments are defined 'as lasting six months or less.'"  Crosby v. McDonald's of Guilderland, LLC, No. 1:17-CV-1160, 2018 WL 2077884, *3 (N.D.N.Y. May 2, 2018) (quoting 42 U.S.C. § 12102(3)(B)).

Although "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor[,]" the Court is not required to accept unsupported allegations.  Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.1994) (citation omitted).  Plaintiff summarily asserts that she is "a qualified individual with a disability" and "Albany City School District is aware of [her] disability." Compl. at 6.  Plaintiff does not explain what her disability is, whether she has a diagnosis for an impairment, or how such disability substantially limits a major life activity.  See generally Compl.; cf. Peoples v. Leon, No. 9:18-CV-1349 (LEK/DEP), 2019 WL 13158025, at *6 (N.D.N.Y. Feb. 19, 2019) (internal citations and quotation marks omitted) ("To state a viable claim under either the ADA . . ., a claimant must

allege that they are disabled. . . .  [The p]laintiff explicitly claims that the ADA and Rehabilitation Act apply to him, . . . but nowhere alleges that he has a qualified disability as defined by either statute.  Although [the p]laintiff is correct that [e]xpert medical testimony is not necessary to establish the existence of a disability, some allegation of a disability still must be made to render an ADA and/or Rehabilitation Act claim cognizable.").  Plaintiff states that (1) she had hip surgery and "hip related issue[s]" that caused pain in her knees and shins and required her to take medical leave on numerous occasions, (2) the School District knew of her disability and granted her medical leave,[9] and (3) she was required to attend physical therapy and provided the School District with the prescription.  Compl. at 6-9, 18.  Despite the alleged issues, plaintiff does not allege interference with her ability to work, walk, care for herself, etc.  See 42 U.S.C. § 12102; cf. Cosby v. Rusi, No. 3:20-CV-459 (MPS), 2020 WL 3577482, at *5 (D. Conn. July 1, 2020) ("The court assumes for purposes of this initial review order that [the plaintiff] is a 'qualified individual' who is substantially limited in a major life activity based on his allegations that he has ankle-foot orthosis and uses a wheelchair."); Paschal-Barros v. Quiros, No. 3:21-CV-00698 (SALM), 2022 WL 124544, at *8 (D. Conn. Jan. 13, 2022) (The "plaintiff has made allegations sufficient to demonstrate at the initial review stage that he is a qualified individual with disabilities. [The p]laintiff has been diagnosed with post traumatic stress disorder, and the evaluating physician found that he is 'gravely disabled[ ]' in part because '[h]e is unable to care for his basic needs.'").  As plaintiff has not sufficiently alleged that she is an individual with a qualified disability, her ADA discrimination claim should be dismissed.

---

[9] Some of the leave plaintiff requested under the FMLA was concerning her need to care for her grandson and appears unrelated to her hip issues.  See Compl. at 8.

Cf. Doe v. NYSARC Tr. Serv., Inc., No. 1:20-CV-801 (BKS/CFH), 2020 WL 5757478, at

*4 (N.D.N.Y. Sept. 28, 2020), report and recommendation adopted, 2020 WL 7040982

(N.D.N.Y. Dec. 1, 2020) (permitting ADA discrimination claim to proceed past initial

review where the "plaintiff alleges that he suffers from schizophrenia and mild mental

retardation, which he posits impair his ability to work and care for himself.").

Plaintiff further asserts that she was retaliated against for filing her EEOC claim

and that the retaliation took the form of her being forced to transfer to work at different

schools over slightly different hours. See Compl. at 18.  Specifically, prior to her EEOC

claim being dismissed and her taking medical leave, plaintiff worked Monday through

Friday 7:15am to 3:15pm. See id.  Plaintiff asserts that "[t]he City School District of

Albany partitioned the Board of Education for [her] transfer to another school[.]" Id.

When she returned from leave she was given relocation options at different schools.

See id.  The positions offered and accepted placed plaintiff at two schools that she

would split the day between, starting at one from 8:30am to 12pm, then transferring to

the other from 1pm to 3:30pm. See id.

To establish "[a] prima facie case of retaliation under the ADA[,]" the plaintiff

must show:  "(1) the employee was engaged in an activity protected by the ADA, (2) the

employer was aware of that activity, (3) an employment action adverse to the plaintiff

occurred, and (4) there existed a causal connection between the protected activity and

the adverse employment action." Muller v. Costello, 187 F.3d 298, 311 (2d Cir. 1999)

(citation omitted).  "[A] plaintiff may recover for retaliation by 'show[ing] that a

reasonable employee would have found the challenged action *materially adverse*, which

in this context means *it well might have dissuaded a reasonable worker from making or*

*supporting a charge of discrimination.*'" Davis-Garett v. Urb. Outfitters, Inc., 921 F.3d 30, 43 (2d Cir. 2019) (quoting Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). "An employee transfer can constitute an adverse employment action if 'a reasonable employee would have found the challenged action materially adverse.'" Pistello v. Bd. of Educ. of Canastota Cent. Sch. Dist., No. 5:16-CV-0212 (LEK/ATB), 2017 WL 1194025, at *7 (N.D.N.Y. Mar. 30, 2017) (quoting Williams v. City of N.Y., No. 99-CV-2697, 2006 WL 2668211, at *21 (E.D.N.Y. Sept. 11, 2006) (additional citation omitted).

As this stage, plaintiff has sufficiently plead an ADA retaliation claim.  Plaintiff's EEOC complaint constitutes protected activity.  See 42 U.S.C.A. § 12203(a); Atkins v. Walmart, Inc., No. 6:20-CV-1217 (ATB), 2022 WL 1320300, at *25 (N.D.N.Y. May 2, 2022).  There is also sufficient information to indicate that the School District knew of the charge as the School District was named in the EEOC complaint, the School District hired an attorney to represent it in the proceedings, and the School District was sent the EEOC dismissal determination.  See Compl. at 17-18; Dkt. No. 4.  Plaintiff further asserts that she was forced to transfer schools and adopt new work hours as a result of her filing the claim.  See Compl. at 17-19.  The undersigned makes no determination about the sufficiency of the merits of plaintiff's claim but it is sufficient to survive initial review.

### b. Family Medical Leave Act

To allege that the School District interfered with her exercise of FMLA rights, plaintiff must demonstrate that: "(1) [] she is an 'eligible employee' under the FMLA; (2) that defendants constitute an employer under the FMLA; (3) [] she was entitled to leave under the FMLA; (4) [] she gave notice to defendants of her intention to take leave; and

(5) [] defendants denied her benefits to which she was entitled by the FMLA." Kim v. Goldberg, Weprin, Finkel Goldstein, LLP, 862 F. Supp. 2d 311, 317 (S.D.N.Y. 2012) (quoting Roberts v. Ground Handling, Inc., 499 F. Supp. 2d 340, 351 (S.D.N.Y.2007) (quotations and citations omitted)).  "In the absence of an agreement, employees are entitled to intermittent leave under the FMLA only if they are taking time off to care for a family member with a serious health condition or because of the employee's own serious health condition when the intermittent leave is medically necessary." Id. (citation omitted).  "The term 'serious health condition' is defined as 'an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider.'" Barber v. Von Roll U.S.A., Inc., No. 1:14-CV-907 (MAD/TWD), 2015 WL 5023624, at *7 (N.D.N.Y. Aug. 25, 2015) (quoting 29 U.S.C. § 2611(11)).  "A serious health condition involving continuing treatment by a health care provider includes[,]" in relevant part, "[c]onditions requiring multiple treatments."  29 C.F.R. § 825.115(e).  Such conditions are defined as "[a]ny period of absence to receive multiple treatments . . . by a health care provider . . . under orders of, or on referral by, a health care provider, for . . . [a] condition that would likely result in a period of incapacity of more than three consecutive, full calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), or kidney disease (dialysis)." Id. § 825.115(e)(2).

At this stage and considering the liberal construction of plaintiff's pro se complaint, she has sufficiently alleged a claim under the FMLA.  Plaintiff asserts that she had been repeatedly granted FMLA leave, she had hip surgery, and she was

required to attend physical therapy twice a week for six weeks as demonstrated by a prescription she gave to the School District.  See Compl. at 8-9.  Despite the apparent medical necessity of physical therapy, plaintiff asserts she was denied intermittent leave.  See id. at 9.  The undersigned makes no determination on the merits of plaintiff's claim but finds that she has sufficiently asserted an FMLA claim against the School District; therefore, it survives initial review.

### b. Title VII

On a preprinted Complaint form, plaintiff marked that she seeks to bring this action pursuant to Title VII of the Civil Rights Act of 1964 and when asked what protected ground she was discriminated on, plaintiff checked "other" and wrote "disability (ADA) (EPA) (GINA) and Civil Rights Act VII[.]"  Compl. at 4.  Title VII prohibits "discriminat[ion] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A Title VII claim is not actionable on the basis of disability discrimination.  See Risco v. McHugh, 868 F. Supp. 2d 75, 111 (S.D.N.Y. 2012) (citation omitted) ("[A] complaint about disability-related discrimination cannot form the basis of a retaliation claim under Title VII[.]"); see also Muszak v. Sears, Roebuck & Co., 63 F. Supp. 2d 292, 300 (W.D.N.Y. 1999) (footnotes omitted) ("[A] Title VII retaliation claim must be for actions protected by Title VII, and, quite simply (unlike the ADA that has its own retaliation prohibition), Title VII does not protect a request for an accommodation on the basis of an alleged disability.").  Throughout plaintiff's complaint, she does not allege discrimination on the basis of her race, color, religion, sex, or national origin.  See generally Compl.  Accordingly, even liberally construed, plaintiff's claims cannot be

22

pursued under Title VII.  See Vance v. Halaquist, No. 6:18-CV-0736 (GTS/TWD), 2018 WL 6174195, at *4, n.3 (N.D.N.Y. July 18, 2018), report and recommendation adopted, 2018 WL 5023786 (N.D.N.Y. Oct. 17, 2018) (concluding that the plaintiff did not allege any Title VII claims despite preparing the complaint "on a pre-printed form generated for use in actions brought pursuant to Title VII of the Civil Rights Act of 1964[.]").

### c. Equal Pay Act

To prove a violation of the EPA, "a plaintiff must establish a prima facie case by satisfying three elements: '(1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; [and] (3) the jobs are performed under similar work conditions.'" United States Equal Emp. Opportunity Comm'n v. Hunter-Tannersville Cent. Sch. Dist., No. 1:21-CV-0352 (LEK/ATB), 2021 WL 5711995, at *2 (N.D.N.Y. Dec. 2, 2021) (quoting Aldrich v. Randolph Cent. School Dist., 963 F.2d 520, 523 (2d. Cir. 1992) (additional citation omitted); see 29 U.S.C.A. § 206(d)(1).  Plaintiff asserts that she was not given a raise despite her increase in job responsibilities unlike "Mrs. Mele."  Compl. at 8.  As plaintiff has not asserted that an individual of the opposite sex received different wages for the same work that plaintiff performs, she has failed to state a claim under the EPA, and it recommended that the claim be dismissed.

### d. Genetic Information Nondiscrimination Act

GINA "makes it an unlawful employment practice for an employer 'to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee.'"  Welch v. Bio-Reference Lab'ys, Inc., No. 1:19-CV-846 (BKS/DJS), 2019

23

WL 4805533, at *2 (N.D.N.Y. Oct. 1, 2019), report and recommendation adopted, 2019

WL 6134359 (N.D.N.Y. Nov. 19, 2019) (quoting 42 U.S.C. § 2000ff-1(a)(1)).  "To state a

claim under GINA, [the p]laintiff must allege '(1) that she was an employee; (2) who was

discharged or deprived of employment opportunities; (3) because of information from

[the p]laintiff's genetic tests.'" Id. (quoting Allen v. Verizon Wireless, 3:12-CV-482

(JCH), 2013 WL 2467923, at *23 (D. Conn. June 6, 2013)) (additional citation omitted).

Plaintiff has not alleged any facts relating to genetic tests. See generally Compl.

Accordingly, any claims under GINA should be dismissed. See Perry v. John A.

Guerrieri, DDS PLLC, 518 F. Supp. 3d 665, 677 (W.D.N.Y. 2021) (dismissing GINA

claim where "there [wa]s no evidence that [the] defendant had any knowledge of [the]

plaintiff's genetic information or medical history"), appeal withdrawn, 2021 WL 4167361

(2d Cir. June 22, 2021).

### e. Intentional Infliction of Emotional Distress

As some of plaintiff's federal law claims can proceed, the Court may exercise

supplemental jurisdiction over a state law claim for intentional infliction of emotional

distress ("IIED") if "the relationship between the federal claim and the state claim

permits the conclusion that the entire action comprises but one constitutional case; []

the federal claim has substance sufficient to confer subject matter jurisdiction . . .; and []

the state and federal claims derive from a common nucleus of operative fact." Orellano

v. Papoosha, No. 3:20-CV-00480 (VLB), 2021 WL 2109132, at *11 (D. Conn. May 25,

2021) (quoting Miller v. Lovett, 879 F.2d 1066, 1071 (2d Cir. 1989), abrogated on other

grounds, Graham v. Connor, 490 U.S. 386 (1989)).

24

Plaintiff asserts that she was subject to harassment and psychological abuse. See Compl. at 4. She asserts that because of various employees' conduct, primarily Mr. Rivers', she was humiliated, embarrassed, had multiple breakdowns, and suffered an anxiety attack the degree of which caused her to go to the "Emergency Room [where she] was provided with a sedative[.]" Id. at 17. Plaintiff's allegations of emotional distress arise from the same facts as her federal claims such that it would be appropriate for the Court to exercise supplemental jurisdiction.

"The tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." Hansel v. Sheridan, 991 F. Supp. 69, 75 (N.D.N.Y. 1998) (citation omitted). "Conduct is extreme and outrageous only where it 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency . . . and [be] utterly intolerable in a civilized community.'" Rother v. NYS Dep't of Corr. & Cmty. Supervision, 970 F. Supp. 2d 78, 104 (N.D.N.Y. 2013) (quoting Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293 (1983)). "As the New York Court of Appeals has recognized: 'the requirements are rigorous, and difficult to satisfy. . . . [O]f the intentional infliction of emotional distress claims considered by this Court, *every one* has failed because the alleged conduct was not sufficiently outrageous.'" Gray v. GC Servs./Apple, No. 1:20-CV-714 (TJM/ATB), 2020 WL 8771257, at *6 (N.D.N.Y. Dec. 9, 2020), report and recommendation adopted, 2021 WL 320742 (N.D.N.Y. Feb. 1, 2021) (quoting Chanko v. Am. Broad. Companies Inc., 27 N.Y.3d 46, 57 (2016)). The conduct plaintiff alleges that resulted in her emotional distress consists of: her belongings being

removed from her desk; her being placed at a new desk; her name being removed from her mailbox and replaced the next day; an e-mail from Mrs. Koldis asking why she did not already know certain information; an e-mail from Mr. Rivers explaining why he felt she was not performing her job well; Mr. Rivers' comments during the meeting between himself, plaintiff, and the Union representative; and plaintiff's belongings being broken and packed away in a drawer prior to her transfer to the new schools. See Compl. at 10-19. This conduct "is simply insufficient to constitute the 'extreme and outrageous' conduct required to maintain a claim for intentional infliction of emotional distress." Gray, 2020 WL 8771257, at *6 (citing Corrado v. N.Y. Unified Court Sys., 163 F. Supp. 3d 1, 24-25, 27 (E.D.N.Y. 2016) (dismissing an IIED claim where the plaintiff's managers, among other things, "directed [another supervisor] to create a pretextual paper trail of performance issues regarding [her] performance," and "e-mailed [her] directly threatening termination if she did not attend counseling sessions"); Thomas v. N.Y.C Dep't of Educ., 938 F. Supp. 2d 334, 344, 359 (E.D.N.Y. 2013) (finding that allegations that the plaintiff was subjected to, among other things, "false accusations, verbal abuse, harassment, loss of employment, . . . threat of bringing or prosecution of false charges used to coerce or force resignation, [and] improper initiation and conduct of disciplinary actions" did not rise to the level of extreme and outrageous)). As plaintiff's allegations do not rise to the level of "extreme and outrageous," it is recommended that the Court dismiss her IIED claim.

### 2. Claims against Honeywell Law Firm

Plaintiff asserts claims for "malpractice and nonfeasance, defamation, slander and libel" against Honeywell, which all arise under state law. Compl. at 19.

26

"Under 28 U.S.C. § 1367(a), federal courts have supplemental jurisdiction to hear state law claims that are so related to federal question claims brought in the same action as to 'form part of the same case or controversy under Article III of the United States Constitution.'" Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. 2004).  "A state law claim forms part of the same controversy if it and the federal claim 'derive from a common nucleus of operative fact.'" Id. (quoting Cicio v. Does, 321 F.3d 83, 97 (2d Cir. 2003) vacated on other grounds Vytra Healthcare v. Cicio, 542 U.S. 933 (2004)) (additional citation omitted).  "This is so even if the state law claim is asserted against a party different from the one named in the federal claim."  Id. (citing 28 U.S.C. § 1367(a) (2000); Kirschner v. Klemons, 225 F.3d 227, 239 (2d Cir. 2000)).  "Claims derive from a common nucleus of operative fact where 'the facts underlying the federal and state claims substantially overlapped or the federal claims necessarily brought the facts underlying the state claim before the court.'" Kriss v. Bayrock Grp., LLC, 10-CV-3959, 2017 WL 4023351, at *2 (S.D.N.Y. Sept. 12, 2017) (quoting Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 335 (2d Cir. 2006)). "To form part of the same case or controversy, the claims must 'arise out of the same series of events.'" Thompson v. Urban Recovery House, LLC, 20-CV-9581, 2022 WL 589957, at *7 (S.D.N.Y. Feb. 28, 2022) (citations omitted).

It appears that the claims against Honeywell arise under the same "nucleus of operative fact" as the alleged state law violations relate to plaintiff's EEOC proceeding which was initiated because of the School District's and its employees' actions, and as a part of Honeywell's representation of the School District.  See Compl. at 16-18.  Plaintiff asserts that Honeywell submitted false statements to the EEOC concerning the alleged

altercation between her and Ms. Koldis—the same altercation that Mr. Rivers mentioned during a meeting with the Union representative.  See id. at 17-18.  As the federal claims bring the facts underlying the state claim before the Court, the undersigned will turn to the merits of the state law claims to determine if plaintiff has sufficiently stated a claim for relief.  See Kriss, 2017 WL 4023351, at *2.

### a. Malpractice Claim

"In order to sustain a legal malpractice claim, a plaintiff must show: (1) the existence of an attorney-client relationship, (2) negligence, (3) which is the proximate cause of a loss, and (4) actual damages."  Droz v. Karl, 736 F. Supp. 2d 520, 524 (N.D.N.Y. 2010) (citing Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir.2006)) (additional citations omitted).  Honeywell represented the School District in the EEOC proceedings.  See Compl. at 17-19.  Plaintiff and Honeywell did not have an attorney-client relationship; thus, plaintiff cannot bring a claim for malpractice.  Accordingly, it is recommended that any malpractice claim be dismissed with prejudice and without leave to amend as plaintiff cannot assert a cognizable malpractice claim.

### b. Slander, Defamation, and Libel Claims

"Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name."  Hogan v. Herald Co., 84 A.D.2d 470, 474 (N.Y. App. Div. 4th Dep't 1982), aff'd 58 N.Y.2d 630 (N.Y. 1982).  "Generally, spoken defamatory words are slander; written defamatory words are libel."  Albert v. Loksen, 239 F.3d 256, 265 (2d Cir. 2001).  "Under New York law, to state a claim for defamation, a plaintiff must allege '(1) a written [or spoken] defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the

defamatory statement, and (5) special damages or per se actionability.'" <u>Kesner v. Dow Jones & Co., Inc.</u>, 515 F. Supp. 3d 149, 169-70 (S.D.N.Y. 2021), <u>appeal dismissed</u> (Apr. 16, 2021) (quoting <u>Palin v. N.Y. Times Co.</u>, 940 F.3d 804, 809 (2d Cir. 2019)).

Plaintiff asserts that Honeywell "knowingly submitted falsified documentation to the EEOC[.]"  Compl. at 17.  Plaintiff asserts that during the EEOC proceedings Honeywell submitted documents contending that plaintiff threatened to hit Ms. Koldis.  <u>See</u> <u>id.</u> at 17-18.  Plaintiff contends that "[t]here are cameras in front of [her] desk and in the office that could validate" her version of the story that she never saw Ms. Koldis the day that the threat is being alleged and she did not "call" Ms. Koldis "to say a word."  <u>Id.</u> at 18.

The statements made or submitted during the EEOC proceeding are privileged and plaintiff's claims must be dismissed.  This is because "[s]tatements uttered in the course of a judicial or quasi-judicial proceeding are absolutely privileged so long as they are material and pertinent to the questions involved notwithstanding the motive with which they are made." <u>Weitz v. Wagner</u>, No. 07-CV-1106 (ERK/ETB), 2008 WL 5605669, at *7 (E.D.N.Y. July 24, 2008), <u>adopted</u> (Aug. 11, 2008) (quoting <u>Aequitron Med., Inc. v. Dyro</u>, 999 F. Supp. 294, 298 (E.D.N.Y.1998)).  "This privilege applies to statements submitted to agencies such as the EEOC." <u>Bernstein v. Seeman</u>, 593 F. Supp. 2d 630, 636 (S.D.N.Y. 2009) (collecting cases); <u>see also</u> <u>Kamdem-Ouaffo v. Balchem Corp.</u>, No. 17-CV-2810 (KMK), 2018 WL 4386092, at *19 (S.D.N.Y. Sept. 14, 2018) ("[T]he statement was directly related to one of the issues that the Division of Human Rights and EEOC had been asked to decide: namely, the reasons for [the p]laintiff's termination. . . .  Accordingly, [the d]efendants cannot be liable for defamation

even if the statement was false."); <u>Chandler v. Houghton Mifflin Harcourt Publ'g Co.</u>, No. 5:17-CV-0457 (GTS/ATB), 2018 WL 357294, at *10 (N.D.N.Y. Jan. 10, 2018) ("[T]he Court agrees with Defendants that statements made in the context of an EEOC proceeding are absolutely privileged and cannot give rise to liability.").  As the only statements made by Honeywell that plaintiff challenges were made as part of the EEOC proceedings, the statements are absolutely privileged, and the claims must be dismissed.

### III. Conclusion

**WHEREFORE**, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's application to proceed <u>in forma pauperis</u> (Dkt. No. 2) is **GRANTED** for purposes of filing; and it is further

**ORDERED**, that plaintiff's claims for retaliation under the ADA and a violation of the FMLA proceed against the Albany City School District; and it is further

**RECOMMENDED**, that plaintiff's claims against the Albany City School District for discrimination under the ADA, violations of the EPA, GINA, and Title VII, and state law intentional infliction of emotional distress (Dkt. No. 1) be **DISMISSED WITHOUT PREJUDICE WITH LEAVE TO AMEND**[10]; and it is further

**RECOMMENDED**, that the claims against the Honeywell Law Firm be **DISMISSED WITH PREJUDICE and without leave to amend**; and it is further

---

[10] Plaintiff is advised that an amended complaint is intended to completely replace the prior complaint in the action, and thus it "renders [any prior complaint] of no legal effect."  <u>International Controls Corp. v. Vesco</u>, 556 F.2d 665, 668 (2d Cir. 1977), <u>cert. denied sub nom.</u>, <u>Vesco & Co., Inc. v. International Controls Corp.</u>, 434 U.S. 1014(1978); <u>see</u> <u>also</u> <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994).  Therefore, any amended complaint must include all of the allegations against the defendants against whom the case is going forward so that the amended complaint may stand alone as the sole complaint in this action.

**RECOMMENDED**, that should the District Judge adopt this Report-Recommendation and Order, plaintiff be given thirty (30) days from the date of the Order adopting this Report-Recommendation and Order to file an amended complaint, and if plaintiff does not file an amended complaint, (1) it will be deemed as an abandonment of any claims for which leave to replead has been granted and will result in judgment being entered against plaintiff on these claims without further order by the Court, and (2) the matter be returned to the Magistrate Judge for service of the original complaint for any claims that were permitted to proceed in the original complaint, with all other claims deemed stricken.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).[11]

Dated:  May 12, 2022
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[11] If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Id. § 6(a)(1)(c).